# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 15, 2014

## STATE OF TENNESSEE v. DEJUAN KOSHIEF ROBERTS

**Appeal from the Circuit Court for Bedford County**
No. 17418     Robert Crigler, Judge

---

**No. M2012-02730-CCA-R3-CD - Filed February 25, 2014**

---

A Bedford County jury found the Defendant, Dejuan Koshief Roberts, guilty of aggravated assault, reckless endangerment, and being a felon in possession of a handgun. The trial court imposed an effective Range II thirteen-year sentence. The Defendant appeals claiming that the evidence is insufficient to support his convictions and that the State violated the rules of discovery. After a thorough review of the record, the briefs, and relevant authorities, we conclude that no error exists. Accordingly, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Carla Kent Ford, Murfreesboro, Tennessee, for the Appellant, Dejuan Koshief Roberts.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Robert Carter, District Attorney General; and Michael Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant shooting a weapon outside the Barefoot Bay Café in Shelbyville, Tennessee. Based on this event, a Bedford County grand jury indicted the Defendant for aggravated assault, reckless endangerment, and being a felon in possession of a handgun.

At a trial on these charges, the parties presented the following evidence: Tony

Solomon testified that he was currently employed as a guard at the Bedford County jail but that he worked as a security guard at the Barefoot Bay Café in March 2011. On Friday night, March 25, 2011, the Defendant was at the Barefoot Bay Café. At some point during the night, the Defendant became engaged in a dispute with another patron, Nakeyisha Muse. Mr. Solomon testified that the Defendant had been addressed earlier in the evening by another employee about disruptive behavior, so Mr. Solomon asked the Defendant to leave. Mr. Solomon explained that it was company policy to warn a guest one time and that the second time the patron was asked to leave. Mr. Solomon said that he placed his hand on the Defendant's back and led him to the door. While inside the establishment, the Defendant argued with Mr. Solomon about being asked to leave, but once the two men reached the door, the Defendant exited.

Mr. Solomon testified that he followed the Defendant outside to make sure the Defendant got into his car and drove away. The Defendant reached his car and opened the door. Mr. Solomon then observed the Defendant reach his right hand toward his waist band and retrieve a handgun. The Defendant then fired the gun in the air at an approximate "45-degree angle." Mr. Solomon stated that had the Defendant fired directly in front of him instead of at an angle, he would have fired directly at Mr. Solomon. Mr. Solomon explained that the Defendant was shooting in his direction but above Mr. Solomon. Mr. Solomon stated that other patrons had come outside of the establishment and were standing behind Mr. Solomon. There were also patrons observing these events from the windows behind Mr. Solomon. Mr. Solomon testified that he felt "fear" when the Defendant fired his weapon, so he put his hands up and backed away from the Defendant toward the door of the Barefoot Bay Café. He explained that he did this to show the Defendant that he was not a threat. Mr. Solomon said that he was unarmed at the time of these events.

Mr. Solomon testified that, after firing the gun, the Defendant stated, "Man, f**k this club; I will come back." The Defendant got into his car, drove to the end of the parking lot, got out of his vehicle and fired the weapon again. Mr. Solomon said that the Defendant fired his weapon four times before he got into his vehicle and then at least one time after he drove to the end of the parking lot. He explained that he "lost count after that."

Mr. Solomon testified that, after he lost sight of the Defendant who was driving away, he called the police department and provided a description of the Defendant and his vehicle. Mr. Solomon stated that, at the time, he did not know the Defendant's name and had never seen him before. Mr. Solomon recalled that, after he called the police but before authorities arrived, patrons began exiting the Barefoot Bay Café and driving away through the parking lot.

Mr. Solomon testified that on March 30, 2011, he provided a written statement at the

police department and identified the Defendant in a photographic line-up. Mr. Solomon said that upon looking at the photographic line-up, he identified the Defendant "pretty much instantly."

On cross-examination, Mr. Solomon testified that, as the only person working security that night, he would have "patted down" all patrons, including the Defendant, as they entered the Barefoot Bay Café. Mr. Solomon agreed that he did not find a weapon on the Defendant when he patted him down upon entry. Mr. Solomon said that Nakeyisha Muse approached him about the Defendant. The arguing continued, so Mr. Solomon asked the Defendant to leave. Mr. Solomon said that he recognized Ms. Muse from previous times she had been at Barefoot Bay Café, but he did not recognize the Defendant.

Mr. Solomon testified that the Defendant was parked in the first row of cars at the front of the building approximately ten feet from the front door. He estimated that he was half way between the Defendant's car and the door to the Barefoot Bay Café when the Defendant fired his weapon. Mr. Solomon said that the Defendant drove out past him to the end of the parking lot, approximately fifteen feet beyond where Mr. Solomon was standing by the front door of the Barefoot Bay Café and fired his weapon again.

Mr. Solomon testified that, after starting at his new job at the Bedford County jail, he had occasion to come into contact with the Defendant. Mr. Solomon recalled that the Defendant approached him in the jail and wanted to talk about the charges. Mr. Solomon said that he told the Defendant that he could not talk with him about the case. The Defendant told Mr. Solomon that "it wasn't him" and that he did not have a gun that night. Mr. Solomon said that, at the time, he was dealing with approximately fifty inmates so at some point he began saying "okay, uh-huh, okay," in response to the Defendant to "keep the calm." Mr. Solomon said that he reported this incident to his superiors.

Nakeyisha Muse testified that she had lived in Shelbyville all her life and had "known of" the Defendant. She explained that her cousin and the Defendant had "bad blood between them." Based on this bad relationship with Ms. Muse's cousin, the Defendant harassed Ms. Muse. Ms. Muse said that the Defendant had driven by her house when she, her cousin, and her children were outside, and "flashed" a gun at them.

Ms. Muse testified that on March 25, 2011, she was at the Barefoot Bay Café. When she arrived, the Defendant was there, and her cousin was leaving. Ms. Muse approached the Defendant, who was wearing a jacket, and asked him to "stop bothering [her], stop coming by [her] house." The Defendant responded, "keep those sucker a** n***ers away from [your] house." Ms. Muse told the Defendant that she could "have whoever [she] wanted at [her] house." The Defendant opened his jacket exposing a gun. Ms. Muse asked, "Are you

going to shoot me in the club in front of everybody[?]" And the Defendant "just smirked." Ms. Muse spoke with another patron, "E," and then decided to leave.

Ms. Muse testified that she returned to the Barefoot Bay Café approximately a half hour later. She once again spoke with "E." As the two spoke, the Defendant approached and told "E" to "come on." Ms. Muse said that the Defendant seemed agitated. The Defendant grabbed "E" and when Ms. Muse "made a comment to 'E,'" the Defendant shoved Ms. Muse. Ms. Muse said that she commented to "E," "oh, your daddy is calling you; you have gotta go," and the Defendant responded, "F**k you, b***h." It was at this time that Ms. Muse approached Mr. Solomon and requested help. Ms. Muse said she did not hear the conversation between Mr. Solomon and the Defendant, but based on the Defendant's body language she believed he was "getting upset."

Ms. Muse testified that she and several other people exited the building after Mr. Solomon and the Defendant. She said that she was going to her car to leave. Ms. Muse said that, when she exited the building, she saw the Defendant by his car and Mr. Solomon standing a short distance from the Defendant's car. As she was turned to speak to the person standing next to her, she heard gunshots. She said that upon hearing the gunshots she "shrunk down" and covered her head with her arms. When she looked up, she saw the Defendant with a gun getting into his car.

Ms. Muse testified that, after getting into his car, the Defendant sped out of the parking lot. She heard more gunshots and then the car continued on to Madison Street. As soon as the Defendant's car was out of sight, Ms. Muse went to her car and "left immediately."

Ms. Muse testified that, several days later, she and her cousin went to the police department. She provided the police with a statement and identified the Defendant in a photographic line-up.

On cross-examination, Ms. Muse testified that she did not see the Defendant fire the gun but saw "his hand c[o]me down" while holding a black gun and then get into his car.

Jody Shelton, a Shelbyville Police Department canine patrol officer, testified that he worked the night shift, 6:00 p.m. until 6:00 a.m., on the night and early morning of March 25 and 26, 2011. At 2:25 a.m., he responded to a "shots fired call" at Barefoot Bay Café. As Officer Shelton arrived, he noted that people were driving away from the Barefoot Bay Café. Officer Shelton said he spoke with Mr. Solomon, who described the events surrounding the shooting. Mr. Solomon did not know the name of the shooter but described his appearance and the vehicle in which he drove away.

Officer Shelton testified that the police searched the parking lot for physical evidence, such as shell casings, but recovered nothing. A 9mm shell casing was recovered near the end of the parking lot on Sunlight Drive, the road that runs next to the Barefoot Bay Café.

James Wilkerson, a Shelbyville Police Department officer, testified that he responded to a "shots fired call" at Barefoot Bay Café at 2:25 a.m. on March 26, 2011. As Sergeant Wilkerson approached the Barefoot Bay Café, he noted people exiting the parking lot in cars. After speaking with persons on the scene, Sergeant Wilkerson learned that shots had been fired in the parking lot and also on Sunlight Drive, a side street. Upon learning this, Sergeant Wilkerson and another officer searched the area along Sunlight Drive for evidence of the shooting. Sergeant Wilkerson said that he used his headlights and a spotlight to illuminate the roadway and saw "shiny shell casings laying in the roadway." He said there were three shell casings within an area with a three to four-foot circumference.

Brian Crews, a Shelbyville Police Department detective, testified that this case was assigned to him on Monday, March 26, 2011. Sergeant Crews reviewed the report drafted by a patrol officer who was at the scene and initially thought the case to be "low solvability" because the name of the shooter was not provided at the scene. Several days later, however, Ms. Muse came to the police department and provided key information involving the offense. Ms. Muse identified the Defendant as the shooter. She provided the police with a written statement of the events surrounding the shooting and identified the Defendant in a photographic line-up. At a later time, Sergeant Crews asked Mr. Solomon to come to the police station and view a photographic line-up containing a photograph of the Defendant. Mr. Solomon also identified the Defendant as the shooter.

Sergeant Crews testified that, as part of his investigation, he checked the Defendant's criminal history and discovered that the Defendant had been convicted of the sale of crack cocaine on three separate occasions in 2009. The trial court admitted into evidence certified copies of the Defendant's prior felony convictions. After obtaining a warrant for the Defendant's arrest, Sergeant Crews went to a residence where he believed the Defendant was living. The Defendant was not there, but based on Sergeant Crews's interaction with a female at the residence, he believed that the Defendant was "on the run." Several months later, the Defendant was apprehended in Rutherford County, Tennessee.

The Defendant called Charles Hord, who testified that he was at the Barefoot Bay Café on the night of March 26, 2011. Mr. Hord said that the Defendant arrived after him, and Mr. Hord did not see the Defendant with a weapon. Mr. Hord said that he and the Defendant were talking when Ms. Muse approached the Defendant and began asking him about driving down her street. Mr. Hord described her as "agitated" and recalled that the Defendant walked away, but Ms. Muse "wouldn't really let it go." Approximately thirty

minutes later, the Defendant told Mr. Hord that he was going to leave because "she was getting on his nerves." Mr. Hord said that he saw the Defendant leave the Barefoot Bay Café by himself at around midnight. Mr. Hord said that he left the Barefoot Bay Café at around 1:30 a.m., and he never heard any kind of gunfire outside. He said that he thought the bar closed at 2:00 a.m., and Ms. Muse was still there when he left. Mr. Hord said that he knew Ms. Muse from high school and he "d[id] her hair." He said that he knew the Defendant through the Defendant's wife, describing his relationship with the Defendant as "acquaintances."

On cross-examination, Mr. Hord said that the reason he never spoke with police about these events is because he "didn't know too much about any of this." Mr. Hord agreed that he knew that Ms. Muse was accusing the Defendant of being the shooter, but he did not go to the police. Mr. Hord said that he did not wear a watch and he was "guessing" when he provided times of events during the night. Mr. Hord agreed that he was unaware of what took place at the Barefoot Bay Café after he left.

Tommy Cannon testified that, at the time of the trial, he was an inmate at the Bedford County jail and had had the opportunity to speak with the Defendant about these offenses. Mr. Cannon said that he was present during a conversation between Mr. Solomon and the Defendant that occurred in the jail. Mr. Cannon said that he heard Mr. Solomon say to the Defendant that he did not see the Defendant with a handgun. Mr. Cannon said that Mr. Solomon did not make that statement as a result of the Defendant badgering Mr. Solomon. He said that he did not know what happened after Mr. Solomon made that statement because he walked away.

Mr. Cannon testified that he had also been at the Barefoot Bay Café on the night of the shootings. Mr. Cannon said that, on the night of the offense, he arrived at the Barefoot Bay Café at around 10:00 p.m., and the Defendant was not there. Mr. Cannon said that, at the end of the night, he heard gunfire as he walked out to his car he heard gunfire. Mr. Cannon said that he was parked close to the front door of the Barefoot Bay Café. He said that he and the Defendant "walked out basically together." Mr. Cannon said that he did not see the Defendant after he heard the gunfire and that he got into his car and left. He did not know the direction from which the gunshots were fired but estimated there were "a few shots."

On cross-examination, Mr. Cannon agreed that he never told police about what he observed on the night of the offenses. He denied that anyone escorted the Defendant out of the establishment that night. Mr. Cannon stated that he was inside his car when the gunshots were fired, and that he could not tell from which direction the shots were fired. He testified that when he heard the shots, he put the car in gear and drove away. Mr. Cannon agreed

that, because he did not look around to see who fired the gun, it could have been the Defendant who fired the gun. Mr. Cannon stated that he only had two beers at the Barefoot Bay Café that night.

William Henry Smith testified that, at the time of trial, he was an inmate at the Bedford County jail. He said that during his incarceration, he had overheard a conversation between Mr. Solomon and the Defendant. He recalled that Mr. Solomon told the Defendant that Sergeant Crews had contacted him about an offense and that Mr. Solomon had told Sergeant Crews that "he didn't know anything about any of that; he didn't see [the Defendant] . . . with no gun." Mr. Smith said that the conversation took approximately two to three minutes and the Defendant "didn't really have too much to say." Mr. Smith said that he and the Defendant had never discussed the case.

Mr. Smith maintained that he had never spoken with the Defendant about the case and guessed that the reason he was testifying was because the Defendant recalled Mr. Smith being present during the conversation. Mr. Smith said that honesty was very important to him. Mr. Smith agreed that he had been convicted of filing a false report. He also agreed that he had been convicted of six felonies and "dozens" of misdemeanor offenses.

Based upon this evidence, the jury convicted the Defendant of aggravated assault, reckless endangerment, and being a felon in possession of a handgun, and the trial court imposed an effective sentence of thirteen years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to support his convictions and that the State violated the rules of discovery. The State responds that the evidence is sufficient to support the Defendant's convictions and that the Defendant has failed to establish that the State committed any discovery violations. We agree with the State.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct

evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally

insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

In this case, the Defendant was convicted of aggravated assault. According to our statutes, "(a)(1) A person commits aggravated assault who: (A) Intentionally or knowingly commits an assault as defined in § 39-13-101 and the assault: (iii) Involved the use or display of a deadly weapon;" T.C.A. § 39-13-102(a)(1)(A)(iii) (2010). According to Tennessee Code Annotated section 39-13-101, a person commits assault who:

(1) Intentionally, knowingly or recklessly causes bodily injury to another;

(2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or

(3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

T.C.A. § 39-13-101(a)(1)-(3) (2010). The Defendant was also convicted of reckless endangerment, which requires proof beyond a reasonable doubt that the Defendant recklessly engaged in conduct that placed or may have placed another person in imminent danger of death or serious bodily injury. T.C.A. § 39-13-103(a) (2012). Regarding the Defendant's conviction for being a felon in possession of a handgun, the State had to prove beyond a reasonable doubt that the Defendant possessed the handgun and had been convicted of a felony. T.C.A. § 39-17-1307(c)(1)(2012).

The evidence viewed in the light most favorable to the State shows that the Defendant, a convicted felon, was involved in an argument with another patron at the Barefoot Bay Café. When he failed to discontinue the interaction, the disgruntled Defendant was asked to leave and was escorted by a security guard from the building. Upon reaching his car, the Defendant pulled a gun from his waist band and fired the gun at a 45 degree angle into the air above the security guard's head. At the time, there were other patrons standing behind the security guard and at the windows of the Barefoot Bay Café. The security guard fearfully placed his hands in the air and backed away from the Defendant. Another patron who was outside at the time of the gunfire responded by placing her hands over her head and ducking in an attempt to protect herself. The Defendant then sped to the end of the parking lot and fired the gun into the air again before driving away. These facts are sufficient to prove beyond a reasonable doubt that the Defendant placed the security guard in fear of imminent bodily injury by use of a deadly weapon and that his conduct placed or might have placed the other persons present in imminent danger of death or serious bodily injury. *See* T.C.A. § 39-13-102(a)(1)(A)(iii); T.C.A. § 39-13-103(a). This evidence further supports that the

Defendant unlawfully possessed a handgun.  T.C.A. § 39-17-1307(c)(1).

Accordingly we conclude that the evidence is sufficient to support the jury's finding the Defendant guilty beyond a reasonable doubt of aggravated assault, reckless endangerment, and being a felon in possession of a handgun.  The Defendant is not entitled to relief as to this issue.

### B. Discovery

The Defendant asserts that the State committed several discovery violations by failing to: (1) provide him with the written statements of witnesses; (2) provide witnesses' criminal records; and (3) failed to inform him of the existence of a potential witness.  The State responds that the Defendant has failed to show that the State committed any discovery violations.  We agree with the State.

### 1. Written Statements

The Defendant argues that he should have been granted a new trial because the State violated the rules announced in *Jencks v. United States*, 353 U.S. 657, (1957), and *Brady v. Maryland*, 373 U.S. 83, (1963), which pertain to witness statements and exculpatory evidence, respectively.  The Defendant contends that he was unable to adequately cross-examine the State's witnesses without the written statements of the witnesses. He claims that "contradicting statements among the State's witnesses" made the written statements "necessary" for impeachment.  The State responds that the Defendant has not shown that there were any written statements that should have been provided.

Rule 26.2 of the Tennessee Rules of Criminal Procedure, also known as Tennessee's version of the Jencks Act, states in pertinent part:

> (a) Motion for Production. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.
>
> . . . .
>
> (c) Recess for Examination of Statement. The court may recess the proceedings to allow time for a party to examine the statement and prepare for its use.

Tenn. R. Crim. P. 26.2 (a) & (e).  The rule also defines a statement as:

> (1) A written statement that the witness makes and signs, or otherwise adopts or approves; or (2) A substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in a stenographic, mechanical, electrical, or other recording or a transcription of such a statement.

Tenn. R. Crim. P. 26.2 (f)(1) & (2).  Pursuant to Rule 26.2, the State has no duty to provide a defendant with a copy of a witness's statement until after the witness has testified on direct examination.  *State v. Caughron*, 855 S.W.2d 526, 535 (Tenn. 1993) (citing *State v. Taylor*, 771 S.W.2d 387, 394 (Tenn. 1989)).

In *Brady v. Maryland*, 373 U.S. 83, 87, 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  To prove a *Brady* violation, a defendant must demonstrate that: (1) he requested the information (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not); (2) that the State suppressed the information; (3) that the information was favorable to the defendant; and (4) that the information was material.  *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001).  The evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The Defendant's discovery request included a request for the "statements and reports of any witnesses, after the witness testifies," pursuant to Rule 26.2.  The Defendant did not request any *Jencks* materials during trial after the direct testimony of the State's witnesses or request an order for production of these statements.  At the motion for new trial hearing, the Defendant argued that the witnesses's written statements were not provided to him in discovery.  The trial court denied the Defendant relief, stating:

> I am sure as to *Jencks*, that the law is that the Court cannot force the State to provide written statements of witnesses in advance of their testimony.
>
> Once they have testified on direct, upon request before cross-examination, the State has to provide that; and actually, the rule works vice versa: If the defense calls proof and the State asks for *Jencks* material after the direct on the defense witness.

First, we note that the Defendant makes a general assertion that he is entitled to witness statements; however, beyond making that assertion, no other discussion of the

existence of those statements, what information those statements may contain, or their materiality to the Defendant's case is addressed in the Defendant's brief. "When a defendant contends that the State has refused to produce a witness's statement as required by Rule 26.2, the defendant must take action to have the statement included in the record on appeal, or this court has nothing to review." *State v. Dalton Lister*, No. E2012-00213-CCA-R3-CD, 2013 WL 3717727, at *5 (Tenn. Crim. App., at Knoxville, July 12, 2013), *no Tenn. R. App. P. 11 application filed* (internal quotation and citation omitted).

Further the Defendant has waived this issue because defense counsel failed to request a copy of the statements during the cross-examination of any State witness and failed to request a recess in order to fully analyze the impact of the reports on the case. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *Joseph Angel Silva, III*, No. M2003-03063-CCA-R3-CD, 2005 WL 1252621, at *10 (Tenn. Crim. App., at Nashville, May 25, 2005), *perm. app. denied* (Tenn. Oct. 17, 2005) ("Any error which resulted from the State's oversight in not providing the Defendant with the physical description of the attacker could have been cured by the Defendant."); *State v. Timmy Fulton*, No. 02C01-9706-CC-00223, 1998 WL 188532, at *4 (Tenn. Crim. App., at Jackson, Apr. 21, 1998), *perm. app. denied* (Tenn. Dec. 28, 1998) ("The trial court did not abuse its discretion in refusing to grant a mistrial for this violation of Rule 26.2; such a sanction would have been inappropriate where the defense held the keys to negating the effect of the error and chose not to do so.").

Accordingly, we can not conclude that the trial court abused its discretion when it denied relief as to this issue.

## 2. Criminal Records

The Defendant next claims that the State committed a *Brady* violation by failing to provide him criminal records for the State's witnesses. The State responds that there is no duty to disclose criminal records for State witnesses.

We are unaware of any rule, statute, or case law requiring the State to provide a defendant with the criminal records of all witnesses, nor does the Defendant cite to law in support of such a requirement. *See State v. King*, 718 S.W.2d 241, 247 (Tenn. 1986) (holding that the State has no duty to provide arrest histories for State witnesses). Additionally, as the State correctly notes, no proof regarding criminal records of the State's witnesses was developed at the motion for new trial.

Accordingly, we conclude that the trial court did not err when it denied the Defendant

relief as this issue.

### 3. Potential Witness

Finally, the Defendant argues that the State failed to disclose the name of a "possible" witness, Emmanuel Houston. The State responds that Houston was never called as a witness and, even so, the Defendant has failed to show that he was prejudiced by the State's failure to list Mr. Houston as a potential witness.

Tennessee Code Annotated section 40-17-106 directs the State to list "the names of such witnesses as [it] intends shall be summoned in the cause" on the charging indictment. *See also* T.C.A. § 40-13-107; Tenn. R. Crim. P. 16, *Advisory Comm'n Comts*. The purpose of this statute is to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the State's proof. This duty is merely directory, not mandatory, however, and therefore the State's failure to include a witness' name on the indictment does not automatically disqualify the witness from testifying. *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992) ("Rule 16, Tenn. R. Crim. P., does not require nor authorize pretrial discovery of the names and addresses of the State's witnesses."). In cases of nondisclosure, a defendant must demonstrate prejudice, bad faith, or undue advantage to obtain relief. *Id*. The determination of whether to allow the witness to testify is left to the sound discretion of the trial judge, which is exercised upon examination of the circumstances presented in that particular case. *State v. Underwood*, 669 S.W.2d 700, 703 (Tenn. Crim. App. 1984) (citing *McBee v. State*, 372 S.W.2d 173 (Tenn. 1963)).

During voir dire, the prosecutor asked the jurors if anyone knew "Emmanuel Houston." At trial, Ms. Muse testified that she was talking to "E," Emmanuel Houston, when she was confronted by the Defendant. The State did not include Mr. Houston's name in response to the Defendant's discovery request.

First, Mr. Houston did not testify at trial. Even assuming that the State intended to call Mr. Houston at trial, the Defendant has failed to show prejudice from the State's nondisclosure. There is no proof in the record as to what Mr. Houston's testimony might have been. Accordingly, we conclude that the trial court did not err when it denied the Defendant relief as to this issue.

### II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the evidence is sufficient to support the Defendant's convictions and that the State did not commit discovery violations warranting relief. Accordingly, we affirm the trial court's

judgments.

_____

ROBERT W. WEDEMEYER, JUDGE